BELARMINO ÁLVAREZ FEITO, Plaintiff and Appellant, v. SECRETARY OF THE TREASURY, Defendant and Appellee.

No. 11037. Submitted November 1, 1955.—Decided June 24, 1957.

16

*Heriberto Torres Solá* for appellant. *J. B. Fernández Badillo, Acting Attorney General,* and *Manuel J. Medina Aymat, Assistant Attorney General,* for appellee. *Vicente Zayas Pizarro, Orlando J. Antonsanti, Benjamín Ortiz, Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella* and *C. Morales, Jr.* for Pedro Juan Serrallés Galiano, the latter as amicus curiæ; and *E. T. Fiddler, José G. González, Tomás I. Nido, Carlos J. Faure, Andrés Guillemard, J. M. Calderón Cerecedo, Richard J. González* and *Pedro Agudo, Jr.; McConnell, Valdés & Kelley; James R. Beverley, R. Castro Fernández* and *Francisco Castro Amy;* and *Manuel I. Vallecillo* as amici curiæ.

### ON MOTION FOR RECONSIDERATION

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

In 1942 Belarmino Álvarez Feito established a trust of corporate stock in favor of his two minor children. In 1950 the then Treasurer notified Álvarez with income tax deficiencies for 1943, 1944 and 1945 on the ground that the income from the trust was attributable to Álvarez. The latter sued in the former Tax Court to set aside the deficiencies. After a trial on the merits, the former Tax Court upheld the action of the Treasurer and dismissed the complaint.

For the reasons stated in its opinion, the majority of this Court affirmed the judgment of the trial court. *Álvarez v. Secretary of the Treasury,* 78 P.R.R. 395. Mr. Justice Pérez Pimentel and the writer of this opinion concurred in the result. The taxpayer filed a motion for reconsideration. In addition, several *amici curiæ* have appeared urging the Court to change the grounds for its judgment. The Secretary of the Treasury has filed his opposition to the motion of the taxpayer and the motions of the *amici curiæ.*

# I

## *Validity of the Trust*

We are met at the threshold of the case with the question of whether as here a trust may be validly created by a father with his property for the benefit of his unemancipated minor children.[1]

This problem was not presented to the trial court or decided by it.[2] Nor was it argued here by the parties in their original briefs. However, since it is examined in detail in the previous majority opinion and in the briefs on reconsideration, we think it advisable to pass on the issue of the validity of the trust herein.

The basic point which must be emphasized at the outset is that in a trust legal title to property and the benefits which flow therefrom are separate. The trustee is the owner of the legal title, whereas the "equitable title" is in the beneficiaries. This division of legal title and equitable ownership is the heart of the trust concept. It is contrary

---

[1] We assume *arguendo*, as the previous majority opinion holds, that an irrevocable trust was created in 1942 despite the prior effort of the father in 1941 to make an absolute gift to the beneficiaries of the shares of stock involved herein. We also assume that no problems are presented by the following: (1) the shares of stock were originally issued to the two minor children and were never transferred to the trustees on the books of the corporation; (2) the dividend checks were issued in the name of the children; (3) the said checks were endorsed in the name of each child "by" the trustee and deposited in a bank account. We also have not considered the requirements of law as to the duration of a trust. See § § 839, 842, 846, and 848 of the Civil Code, 31 L.P.R.A. § § 2546, 2549, 2553, and 2555.

[2] The trial court based its decision on two grounds: First, no valid trust exists because the settlor did not own the stock when he attempted to create the trust in 1942 since he had made a gift thereof to his children in 1941. (We have assumed—and the previous majority opinion holds—that the prior "gift" did not in itself impair the validity of the trust, see footnote 1.) Second, even assuming the trust is valid, the potential right of the children to withdraw the trust income makes it taxable to their father-grantor, citing § § 155–56 of the Civil Code, § 20 (h) of our Income Tax Act, Articles 201 and 207 (2) of Regulations No. 1, *Helvering* v. *Stuart*, 317 U.S. 154, and *Helvering* v. *Clifford*, 309 U.S. 331. We discuss this second ground in Part II, *infra*.

to civil law notions where the trust, as found in Anglo-American law, was formerly unknown.[3] But it has been made part of our Civil Code.[4]

The separation between legal title and equitable interest in a trust was the *ratio decidendi* of Part I in *Belaval v. Court of Eminent Domain, supra.* In that case the parents created a trust of certain real property in favor of their two minor and one conceived but unborn child. Subsequently, the land in question was condemned by the People of Puerto Rico. In a unanimous decision we held, reversing the former Condemnation Court, that the money deposited by the People as compensation for the said property should be paid directly to the trustee instead of following the pro-

---

[3] Patton, *Trust Systems in the Western Hemisphere,* XIX Tulane L.Rev. 398; Patton, *El Futuro de la Legislación de Fideicomiso,* XVII Rev.Jur. U.P.R. 221, 224; Mayda, *"Trusts" and "Living Law" in Europe,* 103 U.Pa. L.Rev. 1041, and authorities cited therein; Bolgár, *Why no Trusts in the Civil Law,* 2 Am.J.Comp.L. 204; 1 Restatement, Trusts, Introductory Note; I Scott on Trusts, 2d ed., pp. 3–10; II, *id.,* pp. 962–74.

[4] Act No. 41, Laws of Puerto Rico, 1928, providing for the constitution of trusts, was incorporated in the Civil Code as §§ 834–74.

Section 834 of the Civil Code, 31 L.P.R.A. 2541, defines a trust as follows: "A trust (*fideicomissum*) is an irrevocable mandate whereby certain property is transferred to a person, named the trustee (*fiduciario*), in order that he may dispose of it as directed by the party who transfers the property, named constituent (*fideicomitente*), for his own benefit or for the benefit of a third party, named the beneficiary (*cestui que trust*) or (*fideicomisario*)."

The phrase "irrevocable mandate" was used in an effort to couch the trust concept in terms familiar to *civilistas.* The wisdom of describing the law of trusts in terms of mandate has been questioned. In any event, *the important thing is that § 834 goes on to recognize that the " . . . property is transferred . . ."* to the trustee. Accordingly, as this Court has recognized, the trustee is the owner of the legal title to the trust property, notwithstanding the characterization in § 834 of a trust as an "irrevocable mandate". *Belaval v. Court of Eminent Domain,* 71 P.R.R. 246; *Clínica Dr. Mario Juliá, Inc. v. Secretary of the Treasury,* 76 P.R.R. 476; *Douglas v. Registrar,* 55 P.R.R. 644; see Patton, *supra,* pp. 413, 420–21, particularly footnote 55. See also, § 865 of the Civil Code, 31 L.P.R.A. § 2572.

The separation between legal title and equitable ownership is illustrated by the doctrine that a person may use his own property to create a trust for himself. Section 834 of the Civil Code, 31 L.P.R.A. § 2541; *Douglas v. Registrar, supra.*

cedure provided in §§ 614 *et seq.* of the Code of Civil Procedure, 1933 ed., 32 L.P.R.A. §§ 2721–23—in connection with §§ 159 and 212 of the Civil Code, 31 L.P.R.A. §§ 616, 786—for the alienation or encumbrance of property belonging to minors.

We pointed out in the *Belaval* case at p. 251 that the contrary order of the former Condemnation Court " . . . is in open conflict with the basic concept of the creation of trusts brought to Puerto Rico by the Act of 1928, which is an adaptation from the one enacted in Panama in 1925 following the Anglo-Saxon system of 'trusts'." After quoting §§ 834, 849, 864–67 of the Civil Code, 31 L.P.R.A. §§ 2541, 2556, 2571–74, relating to trusts, we added at pp. 253–54:

"According to the above provisions the error committed by the lower court is evident in holding that for the investment of the property held in trust the trustee should follow the procedure provided by §§ 614 *et seq.* of the Code of Civil Procedure, wherein, according to the Civil Code, the parents or the tutors of minors or of incapacitated persons need judicial authorization to do anything relative to the keeping of said minors or incapacitated persons or their property. *These cases deal with property belonging to minors or incapacitated persons. In trusts the property which belonged to the settlor has been conveyed to the trustee, who has all rights and interest corresponding to the full ownership,* with the only restriction that the transfer is made in accordance with the mandate of the settlor for the benefit of the beneficiary. . . . *The title to the property transferred in trust is vested [in] the trustee and it is so recorded in the Registry of Property subject to the terms of the trust and not [in] the beneficiary minors in this case.* . . . The party actually interested in obtaining the money deposited in the condemnation proceeding is not the minors but the trustee, since he is the person bound to maintain any action arising in consequence of said proceeding. . . .". (Italics, except "full-ownership", ours).

As the above quotation shows, we recognized in the *Belaval* case that in a trust the property belongs to the trustee,

although it is of course administered for the benefit of the *cestui que trust*. Bearing in mind that the legal title and equitable interest in a trust are separate, we turn to the contention that a trust may not be validly created by a father on behalf of his minor children with property belonging to the father. This contention, which is accepted in the previous majority opinion, can not be reconciled with *Belaval* v. *Court of Eminent Domain, supra,* and *Clínica Dr. Mario Juliá, Inc.* v. *Secretary of the Treasury, supra.* Prior to the present case, this Court had never specifically discussed the question of the validity of a trust created by a father for his minor children under the Civil Code. But in the *Belaval* and *Juliá* cases our decisions were necessarily based on the premise that such a trust is valid.[5]

As already noted, we held in the *Belaval* case that money paid for compensation for condemnation of trust property should be paid directly to the trustee instead of following the procedure provided in § 614 *et seq.* of the Code of Civil Procedure. Even more significant, on the point now under consideration, is the fact that in the *Belaval* case the trustee would not have been entitled to the deposit made by the People if the trust had not been valid.

The *Belaval* case also involved the question of whether property placed in trust for a conceived but unborn child was subject to the gift tax imposed by Act No. 303, Laws of Puerto Rico, 1946, 13 L.P.R.A. §§ 881–905. Under § 1 of Act No. 303, 13 L.P.R.A. § 881, a gift " . . . also includes any transfer in trust *(fideicomiso)*." In the *Belaval* case the child was conceived before the effective date of Act No. 303, but was born after that date. We held in Part II of the *Belaval* opinion that the gift tax need not be paid on this transfer because the trust came into effect when the trust instrument was executed and accepted by the trustee

---

[5] Indeed, as already noted, even in the present case the Secretary of the Treasury did not argue in his original brief here that a father may not validly create a trust for his minor children under the Civil Code.

prior to the effective date of Act No. 303, and not when the child was born subsequent to the effective date of the said Act. We also pointed out that the trust would be liable for the tax imposed under § 20(a)(1) of the income Tax Act. Here again the significance of Part II of the *Belaval* opinion is that our discussion of the gift tax question was predicated on the premise that a trust could be validly created by a father for his minor children, both born and unborn. *Belaval* v. *Court of Eminent Domain, supra,* pp. 255–61.

In the *Juliá* case, Dr. Juliá and his wife created a trust of shares of stock of Clínica Dr. Mario Juliá, Inc., in favor of their two minor children. Under the terms of the trust each of the beneficiaries was entitled to receive 25 per cent of the net income from the trust, not in excess of $2,400; the trustee was empowered to reinvest the remainder of the trust income. The trustee loaned the corporation $70,000 at 5 per cent interest annually. The corporation paid the interest to the trustee in 1946, 1947, and 1948. We held, contrary to the contention of the Secretary of the Treasury, that the corporation was entitled to deduct these interest payments. We so held because, unlike the Federal Act, § 32(a)(2) of our Act, as amended by Act No. 107, Laws of 1943, did not prohibit deductions of such interest payments in connection with a *trust*. *Clínica Dr. Mario Juliá, Inc.* v. *Secretary of the Treasury, supra,* pp. 498–506, 510–12. It is important to note that if the trust had not been valid, the stock would have belonged to Dr. Juliá and his wife rather than to the trustees. And our § 32(a)(2) as it then read would have prohibited deduction of interest paid by the corporation to Dr. Juliá and his wife since they owned the majority of the stock of the corporation. Here again the necessary implication of our decision was that the trust created by Dr. Juliá and his wife for their minor children was valid. In fact, our discussion of *Helvering* v. *Clifford, supra,* in the *Juliá* case at pp. 504–05—and our conclusion therein that the *Clifford* doctrine did not apply to the facts

in the *Juliá case*—would have no meaning unless we were accepting the validity of the trust as such.

We reaffirm the position we implicitly took in the *Belaval* and *Juliá* cases upholding as valid a trust created by a father on behalf of his minor children with property belonging to the father. Under § 855 of the Civil Code, 1930 ed., 31 L.P.R.A. § 2562, a trust may be created " . . . in any form, for any purpose and upon any terms or conditions, not contravening the law or the public morals or not specifically prohibited by this Code." We find nothing in the Civil Code which *specifically prohibits* a father from creating a trust with his property for his minor children. We see no reason for reading such a limitation into § 855. In addition, there are analogous cases which persuade us that such a trust is valid. First, a father may under the proper circumstances make a gift to his minor children.[6] Second, he may create a trust, presumably with his own property, in favor of his future children.[7] Third, as the previous majority opinion concedes in 78 P.R.R. at 405, a trust may be validly created by a stranger in favor of a minor. The problems with reference to property and income of a minor are substantially the same in these three situations as in the instant

---

[6] A trust is different from an outright gift. *Piris* v. *Registrar*, 67 P.R.R. 760. But even in the case of a gift, there is no reason why under the proper circumstances a father may not make a gift to his minor children. II Rodríguez Navarro, *Doctrina Civil del Tribunal Supremo 1798–9*, commenting on § 625 of the Spanish Civil Code, equivalent to § 567 of our Civil Code, 31 L.P.R.A. § 2002; *Piris* v. *Registrar*, *supra;* Federico de Castro, *El Autocontrato en el Derecho Privado Español*, 151 Rev. de Legislación y Jurisprudencia 384, 416 *et seq.* (1927).

[7] Section 845, 31 L.P.R.A. § 2552, reads as follows: "The constitution of a trust in favor of a nonexisting person, excepting only future children of the constituent, is null and void." Section 20(a)(1) of the Income Tax Act has always recognized a trust for unborn children for tax purposes.

It is difficult to believe that the Legislature meant to permit the establishment of such trusts created by a father for future children but to prohibit them for children already born. See the last paragraph of § 867 of the Civil Code.

case. Our Civil Code permits the trusts and gifts in these three cases; in the same way, the trust herein is valid.[7a]

We find nothing in §§ 155–56 of the Civil Code which is incompatible with our conclusion that a trust may be validly created by a father with his property for his minor children. Section 156 plays no role in such a trust as that section does not contemplate the transfer of ownership by the father.[8] Section 155 has no bearing on the corpus of the trust, since as we have seen the latter is "acquired" by the trustee, not by the child.[9] Section 155 would come into play if and when income from the trust was received by the minor beneficiaries in accordance with the trust instrument. Such income would be property acquired by the minors by "*título lucrativo*".[10] And under § 155 the said income would belong as property to the children, but the usufruct of this income would belong to the father herein.

---

[7a] Sections 847 and 774 of the Civil Code, 31 L.P.R.A. §§ 2554 and 2581, prohibit the use of trusts to bypass our inheritance laws. But that precautionary measure does not *per se* make the trust herein invalid. The problems of inheritance in the light of the trust herein will be met when they arise. See the second clause of the trust instrument as set forth in 78 P.R.R. at pp. 402–3.

[8] The first sentence of § 156 provides: "The father or mother possess the ownership and usufruct of whatever property the child may acquire with the capital of each of his parents."

See 4 Castán, *Derecho Civil Español, Común y Foral*, 6th ed., interpreting § 161 of the Spanish Civil Code, equivalent to our § 156, at p. 48: "(a) *Property acquired with the capital of his parents, which is under the son's administration.* As already stated, they replace the old *peculium profectitium*. The children have only the precarious administration over such property transferred to them by the parents (for whom they are true agents); and the parents retain the ownership and the usufruct of the property and of all its fruits, unless they expressly cede to the son the whole or part of the profits obtained, in which case the latter are not subject to collation. (Sec. 161)."

[9] Section 155 reads in part as follows: "Property acquired by an unemancipated child by labor or industry, or for any valuable consideration (*título lucrativo*) belongs to the said child, but the usufruct thereof belongs to the parents having *potestas* over him whilst he lives in their company . . .". (Matter in parenthesis ours.)

[10] We use this Spanish phrase instead of the English "for a valuable consideration" as the latter is not an adequate translation of "*título lucrativo*".

We hold in Part II, in view of the administration and control by the father of the right of the minor beneficiaries to receive the income from the trust herein and of other factors, that the said income is taxable to the father-grantor, although such income is property belonging to the children under § 155. But these considerations as to (1) ownership of the corpus of the trust and the income therefrom under § 155 and (2) the taxability of the latter to the father-grantor under our Income Tax Act, do not impair the validity of the trust created under §§ 834–74 of the Civil Code.[10a] On the contrary, they are part of the pattern whereby we harmonize (1) §§ 155–56 and other sections of the Civil Code, with (2) §§ 834–74 of the Civil Code, providing for the constitution of trusts, and with (3) the sections of the Income Tax Act relating to trust income.[11]

We note finally that in this case we need not pass on the question of whether a father with *patria potestas* may ever waive or alienate the usufruct of property belonging to his minor children. In the first place, as to the corpus of the trust no problem exists: there is nothing for the

[10a] On the question of consent to constitution of the trust, § 849 of the Civil Code, 31 L.P.R.A. § 2556, is controlling. It provides in part: "The legal existence of a trust shall begin at the time when the trustee accepts the mandate and, once accepted, the mandate becomes irrevocable." Section 849 applies here as well as to charitable trusts and to trusts for unborn children under § 845. As already noted, in Part II of *Belaval* v. *Court of Eminent Domain, supra,* pp. 255–61, we specifically held that the trust in that case came into effect when the trustee accepted the trust, and not when the child was subsequently born.

[11] It is interesting to note that a trust was recognized for tax purposes in 1925 by § 20 of our Income Tax Act even before trusts were authorized by Act No. 41, Laws of Puerto Rico, 1928.

Also, while it is not controlling in the case before us, the Legislative Assembly apparently thought in 1954 that a trust like that found here was valid. It provided in § 167(c) of the 1954 Act that trust income is not taxable to the grantor merely because it may be applied for the support of a beneficiary whom the grantor is legally obliged to support, except to the extent such income is in fact so applied. In thus catching up with the Federal Act as it read prior to 1954, see footnote 16, the Legislative Assembly apparently assumed that a trust of the type involved herein was valid.

father to waive, as the trustee, not the child, acquired the trust property. Second, as to the trust income, it is enough to say in this case that the father has not waived the usufruct from said income in view of the fact that—as set forth in detail in Part II—under the Civil Code the right of the minor beneficiaries to withdraw the income as provided in the trust instrument herein gave the father the right to administer and control the trust income.[12]

We hold that the trust in this case is valid even though it was created by a father with his property for the benefit of his unemancipated minor children.[13] We turn to the different question of whether the income from the trust in this case is taxable to the grantor.

## II

*Although the trust is valid, the income therefrom*
*is taxable to the grantor.*

 The vital fact here is that the fifth clause of the trust instrument, as set forth in 78 P.R.R. at 403, directs the trustee to invest the income " . . . which has not been

---

[12] *Cf. Guerra* v. *Ortiz*, 71 P.R.R. 574, affirmed in 187 F.2d 496 (C.A. 1, 1951); *Hernández* v. *Tax Court*, 73 P.R.R. 659; *Fournier* v. *Fournier*, 78 P.R.R. 411; and *Blanco* v. *Tax Court*, 72 P.R.R. 799, 808, none of which is controlling on this particular question.

If the trust instrument specifically required the trustee to accumulate the trust income or to expend it in some way other than delivering it to the minor beneficiary, a different question might be presented as to waiver of the usufruct by the father. We are not required to face that question in this case and make no comment thereon.

[13] Trusts are frequently created for purposes other than income taxation. If this trust were invalid—as indicated in the previous majority opinion—problems involving succession, creditors, and payments to beneficiaries might arise. See Schuyler, *Payments under Void Trusts*, 65 Harv.L.Rev. 597. Other questions would have also beset the parties in the wake of the previous majority opinion. First, would such a trust, although invalid at its inception, become valid if it remained unmodified and the beneficiaries reached their majority? Second, if the latter question were answered in the affirmative, would the trust income under those circumstances be taxable to the grantor after the beneficiaries came of age? Third, what impact would § 167(c) of the income Tax Act—see footnotes 16 and 11—have in this and similar cases as to income earned after its effective date?

withdrawn . . ." by the beneficiaries. As noted in Part I, § 156 of the Civil Code never applies to the corpus or income of a trust, see footnote 8 and text preceding it. Also, as we have seen in Part I, under § 155 the corpus of the trust belongs to the trustee, but any income received therefrom by the minor beneficiaries would be property of the minors; on the other hand, the usufruct of this income would belong to the father-grantor.

Here the trust instrument permits the beneficiaries to withdraw the income. But § 154 required the father (1) to determine whether to exercise this right to withdraw the income and (2) to administer it on behalf of the minor beneficiaries if and when it was collected from the trustee.[14] This power to withdraw and to administer the income on the part of the father—together with the ownership by the father of the usufruct from such income under § 156—are sufficient to make the income from the trust taxable to the father under §§ 22(h) and 15(a) of the Income Tax Act. *Helvering* v. *Stuart, supra,* and *Helvering* v. *Clifford, supra.*

In the *Stuart* case the Supreme Court held at pp. 169–71 that under § 167 of the then Federal Internal Revenue Code a father who created a trust containing a provision that the income thereof might, in the discretion of the trustees, be used for the support of his minor children, was taxable on the trust income even though it was not in fact used for such support. In holding the said income taxable to the grantor under § 167, the court said at pp. 170–71: "Under such a provision the *possibility* of the use of the income to relieve the grantor, pro tanto, of his parental obligation [of support] is sufficient to bring the entire income of these trusts for minors within the rule of attribution [to the

---

[14] Section 154 reads in part as follows: "The administration of the property of children under the *patria potestas* belongs in the first place to the father . . ." *Cf. Blanco* v. *Tax Court, supra,* pp. 808–09.

grantor] laid down in *Douglas* v. *Willcutts* [296 U.S. 1]."
(Underscoring and matter in brackets ours).[15]

Section 20(h) of our Income Tax Act— § 20(h), Laws
of Puerto Rico, 1925, 13 L.P.R.A. § 699(h)—was sub-
stantially copied from § 167 of the Federal Internal Revenue
Code of 1924. It provided in its pertinent part that "Where
any part of the income of a trust may . . . be distributed to
the grantor . . . such part of the income of the trust shall
be included in computing the net income of the grantor."
Section 167 of the Federal Act has been amended from time
to time. But the *Stuart* case arose under § 167 when the
latter was virtually identical with our § 20(h). This por-
tion of the *Stuart* case therefore applies to cases arising
under our § 20(h).[16]

Here the father had the right to determine both whether
the income should be withdrawn and also to administer it
under § 154 of the Civil Code; in addition, he owned the
usufruct therefrom under § 155. Under those circumstances
we think the income is attributable to the father-grantor

---

[15] The *Stuart* case involved revocable trusts. 317 U.S. at pp. 158–59.
But this portion of the case also applies to irrevocable trusts because of
(1) the broad language used by the Supreme Court and (2) the fact that
the trust income was found to be taxable to the grantor under § 167 of
the Federal Act rather than the section which dealt with revocable trusts
—§ 166, the equivalent of our § 20(g). Paul, *Trusts and Federal Tax-
ation*, 31 Taxes 608. Congress realized that this portion of the *Stuart*
case applied to irrevocable trusts. The House and Senate Committees so
stated in their reports recommending an amendment of § 167 which set
aside this portion of the *Stuart* case. II Seidman's, *Legislative History
of Federal Income and Excess Profits Tax Laws*, pp. 2118–21; 6 Mer-
tens, *Law of Federal Income Taxation*, p. 528.

[16] In 1943 Congress added a new subsection (c) to § 167 providing that
income from a trust shall not be considered taxable to the grantor merely
because such income may be applied for the support of a minor beneficiary
except to the extent that such income is in fact so used. Section 134(a)
of the Internal Revenue Act of 1943, 26 U.S.C.A. Int. Rev. Acts; II Seid-
man, *supra*, pp. 2118–19. But § 20(h) of our Act remained in effect from
1924 to 1954, when the Legislative Assembly introduced the 1943 Federal
amendment into our Act. See § 167 of Act No. 91, Laws of Puerto Rico,
1954, known as the Income Tax Act of 1954. Consequently, this portion
of the *Stuart* case applies under § 20(h) of our Act wherever pertinent
to trust income between 1924 and 1954.

under § 22 (h) of the Act. The father here certainly stood to gain as much from the trust as in the *Stuart* case where the only potential benefit the father had was the possibility, which never occurred,[17] that the income might, *in the discretion of the trustee*, be used for the support of his minor children. The *Stuart* case, particularly as reinforced by the *Clifford* case, operates to make the income from the trust herein taxable to the father-grantor under § 22 (h).[18]

*Helvering* v. *Clifford, supra,* reinforces our conclusion that the trust income herein is taxable to the grantor. In that case the Supreme Court held that the income of a trust was taxable under the then § 22 (a) of the Federal Act—our § 15 (a), 13 L.P.R.A. § 694—although not payable to the grantor himself and not to be applied in satisfaction of his legal obligations, if he retained a control of the trust so complete that he was still in practical effect the owner of the corpus of the trust. In *Helvering* v. *Stuart, supra,* at pp. 168–69, the court remanded the case as to one of the trusts involved therein for the trier of the facts to determine

---

[17] As in the *Stuart* case, no income was in fact withdrawn by the beneficiaries in this case. The trustee withdrew some of the money from the bank account in which the dividend checks had been deposited and invested it pursuant to the terms of the trust in real property mortgages; the remainder of the money was left in the bank account.

[18] The problem raised by the holding in the *Stuart* case at pp. 169–71 disappeared from the Federal Act when Congress "legislatively reversed" it in 1943. See footnote 16. Our Legislative Assembly took no action thereon until 1954, when it replaced § 20 (h) of our 1924 Act with § 167 of the Income Tax Act of 1954, Act No. 91, Laws of Puerto Rico, 1954. Our § 167 (c) of 1954, couched in language substantially similar to the 1943 federal amendment "reversing" the *Stuart* case, provides that "income of a trust shall not be considered taxable to the grantor . . . merely because such income, in the discretion of . . . the trustee . . . may be applied or distributed for the support or maintainance of a beneficiary whom the grantor is legally obligated to support or maintain, except to the extent that such income is so applied or distributed." But our § 167 (c) applies only to income covered by the 1954 Act. We therefore leave for another day the consequences which will flow in this jurisdiction from the "legislative repeal" of the *Stuart* case. This will have to be considered together with the *Clifford* problem. As to the present status of the latter, see footnote 20. *Cf.* 6 Mertens, *supra,* § 36.49, pp. 328–30; *id.,* § 36.57, pp. 339–40. And see footnotes 16 and 11.

whether the Federal § 22 (a), read together with the Federal § 167, made it necessary to attribute the income from this particular trust to the grantor. The inference was that the interplay of these two Sections ". . . might operate to justify a tax [on the grantor] under . . . sec. 167, even though sec. 167 would not otherwise have applied." 2 P-H, *Federal Taxes*, 1955, p. 15,150. See *Mallinckrodt* v. *Nunan*, 146 F.2d 1 (C.A. 8, 1945), cert. denied, 324 U.S. 871; *Emery* v. *Commissioner of Internal Revenue*, 156 F.2d 728 (C.A. 1, 1946). *Cf. Commissioner of Internal Revenue* v. *Bateman*, 127 F.2d 266 (C.A. 1, 1942).[19] It follows that in our case even if § 20 (h)—our equivalent of the Federal § 167—were not sufficient, standing alone, to make the trust income attributable to the grantor, § 15 (a)—copied from the Federal § 22 (a)—would, when read together with § 20 (h), require that result under the terms of this trust and in the light of § § 154–55 of the Civil Code and the *Hernández* case, even as to income not in fact withdrawn by the beneficiaries. *Cf.* our discussion of the *Clifford* case as applied to the facts of the *Juliá* case at pp. 504–05 of the latter case, to which we have already adverted in Part I.[20]

---

[19] *Cf. San Gerónimo Develop. Co.* v. *Treasurer of Puerto Rico*, 233 F.2d 126 (C.A. 1, 1956), at p. 133: ". . . the Supreme Court of the United States has many times told us, in rejecting literal interpretations of taxing acts based upon 'attenuated subtleties,' that taxation 'is a practical matter' in which the courts should not be too much concerned with the 'refinements of title.' See *Harrison* v. *Schaffner*, 312 U.S. 579, 581, 582 (1941). See also *Helvering* v. *Clifford*, 309 U.S. 331 (1940)."

See Kennedy, *Federal Income Taxation of Trusts and Estates*, Chapter 6, pp. 558 *et seq.;* 1953 Supp., pp. 74 *et seq.*

[20] The *Clifford* case caused much uncertainty and considerable litigation. See 6 Mertens, *supra*, § 37.17, p. 472 *et seq.;* Paul, *supra*, pp. 613–15; Note, 60 Yale L.J. 1426. As a result the Federal Commissioner promulgated the so-called Clifford Regulations. 26 Code of Federal Regulations § 29.22 (a)–21, 22 (1949); 6 Mertens, *supra*, pp. 484–92; Guterman, *Federal Income Taxation of Inter Vivos Trusts*, 9th Annual Institute on Federal Taxation, N.Y.U., 183; Cleary, *The Clifford Regulations Reexamined*, 12 *id.*, p. 741. Thereafter, in 1954 Congress wrote many of these regulations into the Federal Act; and it also provided that § 61 of the Federal Act of 1954, the counterpart of the former Federal § 22 (a), equivalent to our § 15 (a), shall no longer play any role on the

*Hernández* v. *Tax Court, supra,* arose under different sections of the Civil Code and did not involve property held in trust. Nevertheless, its holding—that income accruing from property belonging to minors is taxable to the conjugal partnership consisting of their mother and stepfather—is wholly compatible with the conclusion we reach here. Moreover, in the *Juliá* case this Court at p. 499 implicitly accepted the reasoning of the trial court that the 25 per cent of the trust income payable to the minor beneficiaries was taxable to their father, the grantor of the trust.[21]

 There remains for consideration Article 225 of Regulations No. 1, substantially copied from the then Federal Regulation, which provides in part: "If a minor has been emancipated by his parent, his earnings are his own income, and such earnings, regardless of amount, are not required to be included in the return of the parent. If the aggregate of the net income of a minor from any property

question before us. Sections 671–78, Federal Internal Revenue Code of 1954; Mertens, *Code Commentary,* by Zimet *et al.,* §§ 671–78, pp. 58–72; Kamin, Surrey and Warren, *The Internal Revenue Code of 1954: Trusts, Estates and Beneficiaries,* 54 Col.L.Rev. 1237, 1259–64; Craven, *Taxation of Estate and Trust Income under the 1954 Code,* 103 U.Pa.L.Rev. 602, 621–28; Holland, Kennedy, Surrey and Warren, *A Proposed Revision of the Federal Income Tax Treatment of Trusts and Estates—American Law Institute Draft,* 53 Col.L.Rev. 316, 358–67; Murray, *Income Taxation of Short-Term and Controlled Trusts,* 1955 Tax Institute, U.S.C. Law School Tax Institute, 497; Greenberger, *Changes in the Income Taxation of Clifford Type Trusts,* 13th Annual Institute on Federal Taxation, N.Y.U., 165. See Rice, *Judicial Trends in Gratuitous Assignments to Avoid Federal Income Taxes,* 64 Yale L.J. 991; Pedrick, *Familial Obligations and Federal Taxation: A Modest Suggestion,* 51 N.W.U. L.Rev. 53.

In Puerto Rico we have only the guidance—or uncertainty, according to some—of the *Clifford* and related cases. We have no regulations or statutory provisions—even in the 1954 Act—as to the effect of the former § 15(a), which is now § 22(a), on the question of whether trust income is attributable to the grantor.

[21] The government's contention in the *Juliá* case as to non-deductibility of interest failed because the amendments to our Act prior to 1954 had not kept pace with the Federal amendments making interest payments to trustees under certain circumstances non-deductible. *Cf.* §§ 24(c)(3) and 24(b)(2)(A) of our Income Tax Act of 1954.

which he possesses, and from any fund held in trust for him by a trustee or guardian, and from his earnings in case he has been emancipated, is at least $1,000, or his gross income is at least $5,000, a return as in the case of any other individual must be made by him or by his guardian, or some other person charged with the care of his person or property for him. See article 231. In the absence of proof to the contrary, a parent will be assumed to have the legal right to the earnings of the minor and must include them in his return."

The second sentence of the above-quoted portion is invalid in view of the result reached here and in the *Hernández* case. We should have so stated in the latter case instead of relying as we did at pp. 667–68 on the presumption in the last sentence of Article 225, which applies only to earned and not to unearned income. See 8 Mertens, *Law of Federal Income Taxation*, § 47.12, pp. 560–61; *id.*, 1955 Supp., p. 228. *Cf.* Articles 201 and 207 of Regulations No. 1.[22]

In some other case a father may conceivably constitute a valid trust on behalf of his minor children which may result in the reduction of the income taxes the family as a whole is required to pay. Whether that is a wise policy is for the Legislative Assembly, not this Court, to determine.

For the reasons stated, the previous majority opinion found in 78 P.R.R. 395, will be withdrawn and will be replaced by this opinion. The motion for reconsideration of the judgment will be denied.

Mr. Justice Negrón Fernández and Mr. Justice Belaval concurred in the result for the reasons stated in the concurring opinion of Mr. Justice Belaval delivered today.

---

[22] It is interesting to note that the Legislative Assembly provided in § 22 (m) (1) of the Income Tax Act of 1954 as follows: "Amounts received in respect of the services of a child shall be included in his gross income and not in the gross income of the parent, even though such amounts are not received by the child."

Mr. Justice Marrero, although absent at the time of signing the opinion and this judgment, took part in the discussion of the motion and agrees with the opinion of the Court.

Mr. Justice Saldaña took no part in the decision of the case.

---

MR. JUSTICE BELAVAL, with whom MR. JUSTICE NEGRÓN FERNÁNDEZ joins, concurring.

The opinion of the majority, on reconsideration, has deemed it advisable to rectify our previous decision insofar as we held that in Puerto Rico a father cannot create a trust inter vivos in favor of two children, aged 12 and 9, who live with their parents, on the ground that the Civil Code of Puerto Rico does not permit the corresponding waiver of the paternal duties as to the administration, representation, and alienation of property of minor children, nor recognizes the separability of property or gains between minor children who live with their parents and such parents, whenever such property is the parents' own property.

The only problem in this case is that the scholars of our law do not wish to focus the problem in the proper manner, considering the following inescapable propositions: (1) the Puerto Rican trust is not the same as the Anglo-Saxon trust; (2) there is a fundamental difference between a testamentary trust and a trust inter vivos under our civil law; (3) the Puerto Rican trust is another civil institution within our codified civil system.

The best reference available as to the intent of the Legislature of Puerto Rico in adopting the Panamaian trust, is a letter sent by Miguel Guerra Mondragón, Vice President of our House of Representatives and author of the bill, to his colleague, Benicio Sánchez Castaño, which is quoted in an article by Ruford G. Patton, entitled "The Trust Systems in the Western Hemisphere," XIX Tul. L. Rev. 398, 419, in which Mr. Guerra Mondragón informs that a repre-

sentative of a local bank (American Colonial Bank) furnished him with a copy of the *Boletín de la Unión Panamericana*, containing an article on the Anglo-Saxon trust by Dr. Alfaro, then Minister of Panama in Washington; that that article convinced him of the necessity of legislating for the purpose of authorizing the creation of trusts, because the executorship provided by our Civil Code did not give the advantages or guarantees provided by the abolished Family Council (*Consejo de Familia*); that the executor might die, might travel, might get sick, might abandon the interests entrusted to him, or might even mismanage the inherited property to the prejudice of the beneficiaries; that, on the other hand, trust companies do not become ill, nor travel, nor neglect the interests of their clients, and that this is true, if not because of honesty, at least for business reasons; that for that matter "those of us who voted for the enactment of the said laws of 1928 had in mind the advantages of quasi-banking institutions over the individual as executor."

We turn to consider the situation in Panama. Dr. Ricardo J. Alfaro having been confronted, in the practice of his profession, with certain problems concerning the administration, in life, and the conservation, after death, of certain inherited property, for which the Panamaian civil law provided no solution, and having discovered that part of those problems were solved by the principles of the Anglo-Saxon trust, he undertook to investigate the possibility of adapting certain principles of the Anglo-Saxon trust to the civil law. It is well to enumerate the problems which in Dr. Alfaro's opinion remained unsolved under the Panamaian civil law: (1) a person who wished to obtain a substantial loan and to secure the same by an industrial or business establishment, in full operation, and its products; (2) three brothers who wished to waive the inheritance of real property in favor of a brother, with a very marked tendency to prodigality; (3) a gentleman of mature age, married to

a young and beautiful woman by whom he had two children to whom he wished to transmit the inheritance, but worried about the fate of the inheritance after his death in the event his wife should remarry; (4) a married woman who did not wish to entrust to her husband the administration of her separate property, yet she did not wish to humiliate him by appointing an attorney in fact or by directly managing the property herself; (5) a father who wished to deliver to his marriageable daughter certain dowry or paraphernal property, excluding, however, the son-in-law from the administration; (6) a donor or testator who wished to protect the property donated, bequeathed, or transmitted against the contingency of a negligent, venturesome, or prodigal administration; (7) a debtor harassed by his creditors, who did not wish to deliver the property to the latter in order not to ruin his credit or go out of business and be subjected to the concourse of creditors; (8) a debtor having sufficient property to pay his creditors, who wished to make a contract of antichresis, but the creditors did not come to an agreement as to which one of them should manage the property; (9) the hypothecation of negotiable securities; (10) the issuance of bonds, certificates of indebtedness, or other stock exchange securities in substantial amounts; (11) other operations involving personal or real property or real and personal rights. See Alfaro, *Adaptación del Trust del Derecho Anglosajón al Derecho Civil*, pp. 10–16 (ed. by Academia Interamericana de Derecho Comparado e Internacional, 1948).

Having examined in their origin the Roman Law institutions known as "inheritance trust" and "residuary trust," and compared them with "trust property" in the Code of Andrés Bello, the provisions on "fideicomissary substitutions" of the European codes and the Anglo-Saxon trust, Dr. Alfaro finds a better solution of continuity between the Roman classical *fidei commissum* and the Anglo-Saxon trust. The only substantial difference between the Roman classical

*fidei commissum* and the Anglo-Saxon trust is that the Roman classical *fidei commissum* was a purely testamentary institution, while the Anglo-Saxon trust is an act inter vivos.

Having examined the circumstances which determined the proscription of the Roman classical *fidei commissum* and its replacement by fideicommissary substitutions, Dr. Alfaro devised a model draft, not along the general lines of the Anglo-Saxon trust as we understand it here, but modernizing the Roman classical *fidei commissum* as to the provision on inheritance, and following the lead suggested by the Code of Andrés Bello on fiduciary property as to the provision on acts inter vivos. Only after this is clearly elucidated may the text of Dr. Alfaro's model draft be correctly interpreted.

Some critics are of the opinion that the new institution should have been called "fiduciary property" or "fiduciary operation," *fiducia* instead of trust. In effect, it would have been more proper to modernize some of the forms of *fiducia cum amico contracta* and *fiducia cum creditore contracta* in the modality of the model draft of trusts inter vivos. See I. J. Arias Ramos, *Derecho Romano*, 421–22 (6th ed. by Editorial Revista de Derecho Privado, 1954). However, we must admit that the real difficulty which Dr. Alfaro encountered was to design an institution which would serve both as a fideicommissary substitution and as a trust inter vivos. As we know, *fiducia* in pure Roman law is fundamentally a real right of guarantee.

The Panama experiment, devised by Dr. Alfaro, could be summed up as follows: In the alternative between the fideicommissary substitution, as recognized by the Spanish Civil Code and the Civil Code of Puerto Rico, and its successor, the Roman classical *fidei commissum*, Panama chose the Roman classical *fidei commissum* plucking from it the perpetuating aspects which caused its discredit and replacement by the fideicommissary substitution. Having chosen that institution, instead of preserving it within the tradi-

tional Romanic sphere of successory institution, it enlarged it to include acts inter vivos so as to make it coincide with some aspects of the Anglo-Saxon trust.

However, this could be so devised in Panama because Panama is a country where there is absolute freedom to testate, there is no system of legal portions, no testamentary fideicommissary substitutions, no interdiction against spendthrifts, unlike Puerto Rico where there is no absolute freedom to testate, there exists a system of legal portions, testamentary fideicommissary substitutions—§ § 703–18 of the Civil Code of Puerto Rico—and tutorship of prodigals—§ 187 of the same Code—may be deferred by will if the incapacitated person has been declared a prodigal prior thereto. In the latter case, the previous tutor of the prodigal may intervene only for the purpose of accepting the inheritance, and the testamentary tutor continues in the discharge of the tutorship, within the limits of the deferment, according to the kind of heir or legatee in question, but always bearing in mind the preference in favor of the testamentary tutor. Section 175 of the Civil Code of Puerto Rico (1930).

These are the differences which compelled the Puerto Rican lawmakers to make certain amendments of a somewhat drastic nature. In Mr. Patton's article referred to above it is stated that the older civil lawyers of the Legislature looked with alarm at the new institution, fearing that it might alter the inheritance system of Puerto Rico. Because of that fear, says Patton, a clause was added to the effect that, "provided nothing contained in this act shall be understood to repeal or modify the system of inheritance established by the Civil Code of Puerto Rico." Moreover, although Mr. Patton does not mention it, another provision was added in § 13 to the effect that "trusts constituted to the detriment or impairment of the legal portion corresponding to the forced heirs, according to the provisions of the Civil Code in force in Puerto Rico, are prohibited and are likewise null and void."

The effect of these amendments, as to the purely testamentary aspects of the trust which we adopted from the Panamaian model, is that they practically annulled all their effects by leaving in force both the fideicommissary substitutions and the system of legal portions. Possibly the only innovation is that executorship or administration of the property of a deceased, which theretofore had to be done by a private person, may now be done by fiduciary institutions. This may be seen more readily by examining the provisions of Act No. 40 of April 23, 1928 (Sess. Laws, p. 234), entitled "An Act to provide for the incorporation and regulation of trust companies, and for other purposes," which is a law *in pari materia*. Only then do the words of Lic. Miguel Guerra Mondragón, author of the bill, acquire full significance in the sense that *"those of us who voted for the enactment of the said laws of 1928 had in mind the advantages of quasi-banking institutions over the individual as executor."*

Hence, the countries which have been most successful in operating the modern Roman *fidei commissum*, or the Anglo-Saxon trust consecrated by the pragmatic jurisprudence, are those countries where there is absolute freedom to testate: England, *United States of America*, with the exception of the State of Louisiana, Canada, Mexico, Costa Rica, Honduras, *Panama*, Nicaragua, San Salvador, and Guatemala (6 Manresa, *Comentarios al Código Civil Español* 289, 7th ed. by Instituto Editorial Reus, 1951), and such countries where fideicommissary substitutions do not exist: England, United States of America, Canada, and Panama.

So much for testamentary trusts. Let us now turn to trusts inter vivos.

The fundamental difference between a testamentary trust and a trust inter vivos for the benefit of a third party is the same difference existing between a will and a contract. The only indication of the legislative intent is that in this modality as well as in the testamentary modality our

trust was patterned after the Panamaian model. We must therefore delve into the Panamaian theory on this matter. Let us hear what Dr. Alfaro, undoubtedly the first authority on all matters concerning the Panamaian trust, has to say in this connection.

"How should a civil-law trust be treated? Should it be treated as a contract, as a unilateral act, as an obligation, or as a real or personal right of the beneficiary?

"The Anglo-American writers have indiscriminately designated the trust as 'a confidence'; as a 'holding of properties'; as a 'right of property'; as an 'equitable right, title, or interest in property'; and, lastly, as 'an obligation.' The recent act of the State of Louisiana, following the language of the definition formulated by the American Law Institute, designates the trust as 'a fiduciary relationship,' and Lepaulle, the exponent, after a detailed analysis designates it simply as a 'juridical institution' which consists of two elements: a patrimony and an affectation. . . .

"Bearing in mind that the determinative cause of the trust is the will of the constituent, the tendency to treat it as a unilateral act in the nature of a will or a donation is altogether natural in the Latin mentality. However, a trust such as that created by the Louisiana act, *or a trust such as that created by the Panamaian statute, presents in general the features of a contract which creates rights and obligations between the three parties thereto.*

"In the first place, the legal existence of the trust commences with the acceptance of the commissioin by the fiduciary. This is so provided by the Panama act and the Louisiana act. By such acceptance, *he assumes on behalf of the constituent, if living,* the obligation to fulfill his commission, and, as to the beneficiary, the obligation to do or to give him the things provided for his benefit, not only in the trust deed but also by law. Several sections of the Panamaian and Puerto Rican acts provide the manner in which the fiduciary should discharge his duties and manage the trust prop-

erties. But the fiduciary has not only obligations; he also acquires rights as, for example, the right to compensation for his work, unless otherwise stipulated. The beneficiary, in turn, acquires the right to receive the benefit provided for in his favor. The law also gives him, expressly or impliedly, the right to exercise all precatory, conservative or essential, special or ordinary, real or personal actions which may be necessary to carry out the purpose of the trust. As respects the constituent, it would seem at first blush that, once the properties are transmitted by him to the fiduciary, he goes out of the picture without retaining any right. When the trust is extinguished by certain causes, the properties in possession of the fiduciary will revert to the constituent, which means that the latter has the right to recover them from the fiduciary. . . .

"My conclusion is, therefore, that although it is difficult to treat the Anglo-American trust by a single civil-law formula, the *fideicomiso*, according to the prevailing legal criterion, presents in general the characteristics of a contract which creates mutual rights and obligations between the parties. These characteristics are more or less strong, depending on the purposes for which the trust is created." Alfaro, *op. cit.* 39–41.

It will be noted that the incorporation of some of the principles of the Anglo-Saxon trust into the Panamaian Law was not intended to create an independent civil institution bearing no relation to the rest of the civil system, but a civil institution coming more properly within the civil system. This is evident all throughout Dr. Alfaro's annotation. Moreover, it is invariably the policy followed in a country governed by a civil system. The difference between incorporating a law institution in a civil-law country and incorporating it in a noncivil-law country lies in the fact that in the former case the institution is not left floating in the air, as something new, extraneous, and hostile to the secular system, while in the latter case the institution may subsist com-

pletely independent of the rest of the usage and jurisprudence because it has not an organic body of principles to regulate, generally, the entire juridical system of the country. Since the Panamaian trust taken as a model was designed to be grafted into a civil system without altering our general civil order, it can be used in its fashion of trust inter vivos, for the benefit of a third party, as an additional typical contract, as in pledge, deposit, antichresis, and the mortgage, in any number of cases, if we understand it correctly, without losing our heads and without attempting to adulterate it within the uncommon and innominate forms of the Anglo-Saxon trust. The typical cases commented by Dr. Alfaro in his interesting annotation dealing with trusts inter vivos are indicative of its potentiality as such contract.

In the case of Puerto Rico, there is no doubt that it was the legislative intent to incorporate the trust in our Civil Code as another civil institution, subject to all the provisions of our Code. The second paragraph of § 9 of Act No. 48 of April 28, 1930 (Sess. Laws, p. 368), which provides, "All the provisions of the acts stated below, which are not at present contained in this Code, and which were incorporated into it by the Code Commission, are hereby included in this Code: . . . (f) An Act to provide for the incorporation and regulation of trust companies, and for other purposes, approved April 23, 1928," and the final provision of the Civil Code of Puerto Rico of 1930 which provides, "The Civil Code" and all other laws or bodies of law *which directly or indirectly are in conflict with the provision of this Revised Civil Code* are repealed and left without force or effect, both as laws directly binding, and as supplementary law. This provision is not applicable to the laws which in this revised Code are declared to be continued in force," leave no room for doubt that we are concerned with a case of codified law rather than compiled law, or of private law applicable to a class, or of a special law applicable to a matter not comprised in the Code. As we know,

the numbered sections of a Civil Code form a coordinated homogeneous body, wholly interrelated, whose different institutions do not contradict each other and whose rational structure is based on doctrinal integrity and not on doctrinal diversity. Only in that way does § 855, which provides, "The constituent of a trust may create a trust in any form, for any purpose and upon any terms or conditions not contravening the *law* or the public morals or not specifically prohibited by this Code . . . ," acquire full significance. Naturally, this was feasible in Puerto Rico because of the work which had already been done by the Panamaian jurists, particularly Dr. Alfaro, in adapting some of the principles of the Anglo-Saxon trust to a codified civil system.

But there is another criterion which aids us more in concluding that the sections of our Civil Code dealing with trusts form part of our codified civil system: concordance. It is well to note the concordance between § 834, dealing with trusts, and § § 1600 and 1605, dealing with agency; between § 835, dealing with trusts, and § § 560, 582, and 586, dealing with gifts inter vivos, and §§ 616 and 620, dealing with wills, and § 703, dealing with fideicommissary substitutions; between § 838, dealing with trusts, and § 575, dealing with gifts, and § 1181, dealing with the date of the private document; between § 839, dealing with trusts, and § § 1068, 1070, 1071, and 1078, dealing with conditional obligations, with a fixed period, etc.; between § 840, dealing with trusts, and § § 398 and 1207, dealing with the permissible terms and conditions in a contract; between § 841, dealing with trusts, and § 443, dealing with usufruct period; between § 842, dealing with trusts, and § § 396, 451, and 454, dealing with use and habitation, and § 716, dealing with fideicommissary substitutions; between § 843, dealing with trusts, and § 713, dealing with fideicommissary substitutions; between § 845, dealing with trusts, and § § 569 and 586, dealing with reduction of gifts by reason of survival of the children, and § § 710 and 711, dealing with fideicommissary

substitutions, and § 914, dealing with posthumous children; between § 846, dealing with trusts, and § § 710 and 711, dealing with fideicommissary substitutions; between § 847, dealing with trusts, and § § 676 and 685, dealing with disqualifications to succeed; between § 848, dealing with trusts, and § 443, dealing with usufruct; between § 849, dealing with trusts, and § 1609, dealing with agency; between § 851, dealing with trusts, and § 216, dealing with tutorships, and § 1602, dealing with agency; § 852, dealing with trusts, and § 217, dealing with tutorships, and § 1625, dealing with agency; between § 855, dealing with trusts, and § 814, dealing with permissible agreements and conditions in a contract; between § 857, dealing with trusts, and § 703, dealing with fideicommissary substitutions; between § 859, dealing with trusts, and § 195, dealing with tutorships; between § 860, dealing with trusts, and § 175, dealing with tutorship; between § 861, dealing with trusts, and § 821, dealing with tutorship; between § 862, dealing with trusts, and § 220, dealing with tutorship; and between § 865, dealing with trusts, and § 212, dealing with tutorship. This, of course, is nothing more than what may be called gross concordance of the most obvious things, where the similarity strikes at first glance. If we were to use a more phenomenological method, it could be categorically asserted that between the civil institutions of agency, gift, tutorship, usufruct, fideicommissary substitutions, and the trust, properly understood, there is such identity of essence that it would not be necessary to establish any similarity by mere deduction.

It should be clear now that, whenever we come across a juridical problem involving trusts, we are dealing with a case of pure Puerto Rican civil law.

We have said that the difference between a trust *mortis causa* and a trust inter vivos is the same difference existing between a will and a contract. A trust inter vivos when it is not in favor of the constituent himself is a contract for the benefit of a third party. Any doubt in this connection

is expressly determined by § 834, which provides: "A trust (*fidei commissum*) is an irrevocable mandate whereby certain property is transferred to a person, named the trustee (*fiduciario*), in order that he may dispose of it as directed by the party who transfers the property, named constituent (*fidei comitente*), . . . for the benefit of a third party, named the beneficiary (*cestui que trust*) or (*fideicomisario*)." Since such obligation is for the benefit of a third party, it is not perfected without the acceptance by the beneficiary. Section 1209 of the Civil Code of Puerto Rico.

The confusion in the sense that the third party is not bound to accept the obligation created for his benefit in order that such obligation may be perfected, seems to flow from the belief that the Civil Code of Puerto Rico contains, as other codes, a separate chapter on pollicitation devoted to the unilateral declaration of the will in acts inter vivos, in which are included the offers to the public, agreements in favor of third parties, and the obligation in civil documents to order and to the bearer. If this generic permissibility were applicable to a nominate civil contract—in my opinion it is not— we would still have to consider that such chapter does not exist in the Civil Code of Puerto Rico; that what does exist in that Code is the express declaration that the obligations for the benefit of a third party will not be perfected until the contract is accepted by the beneficiary, which is more rational and juridical.

The exceptions to this general rule are the obligations for the benefit of an innominate or generic third party, and mostly all of them are expressly authorized by law. See, for example, Act No. 33 of March 7, 1912 (Sess. Laws, p. 67), which amends § 153 of the Mortgage Law, and art. 132 of the Regulations for the Execution of the Mortgage Law, which in the part pertinent hereto provides: "Such obligations may be constituted by the owner of an estate or interest, without specifying the name of the creditor, executing them generically to the order of the person

in whose favor the handwritten documents may be transferred or endorsed by the mortgager," and the provision of our Insurance Law of 1921 (Sess. Laws, p. 522) bearing on group policies covering the life or health of a person, or injuries or physical disability resulting from accident. In like manner, there would be included the trusts for nonprofit purposes, in the form of bequests for charity institutions authorized both by our system of fideicommissary substitutions and by the same sections dealing with trusts, as amended.

The majority opinion, on reconsideration, seems to find support for its conclusion to the effect that the third beneficiary is not bound to accept the trust in order that it may be perfected, on our previous decisions based on § 849 of our Code, which provides: "The legal existence of a trust shall begin at the time when the trustee accepts the mandate and, once accepted, the mandate becomes irrevocable." This is not a new principle in civil law. The agent, whether called attorney in fact or fiduciary, is bound by the acceptance to carry out the agency and shall be liable for the losses and damages caused to the principal through his noncompliance — § 1609 of the Civil Code—but this does not mean that by the mere acceptance of the agency, which is an interindividual relation between two persons strictly for purposes of administration or custody, other persons extraneous to such relation become obligated; the tutor in charge of the administration of a legacy bequeathed to a minor is bound to accept the appointment and also to register the same in the Registry of Tutorships— § 175 of the Civil Code—but such acceptance is not effective as to the minor until the legacy has been accepted by the father, mother, or the universal tutor; the testamentary executor is bound to accept the executorship, unless he excuses himself within six days following that on which he has received notice of his appointment—§ 820 of the Civil Code—but this does not mean that the heirs are subject to the conditions and charges of an

inheritance until it is accepted by the heirs on their own account. Therefore, the acceptance by the fiduciary, in our present state of law, in the case of a trust inter vivos, simply means an interindividual relation, administrative in character, which does not bind the third beneficiary unless he accepts it.

If the purpose of a trust inter vivos for the benefit of a third party is the individualization of a patrimony, as something distinct and separate from the constituent's patrimony, the only way of accomplishing it is through the express approval of the third beneficiary. Nor would the fact that the fiduciary has all or some of the rights and actions inherent in fee-simple ownership create the individualization of the patrimony, which is the aim sought—§ § 865 and 866 of our Civil Code. In the same boat are the agent having a general or special power and the testamentary executor or substitute heir, according to the terms of the will. Furthermore, in a trust there is no occasion for absolute irreversibility presupposed by the transmission in fee simple. A mere glance at the sections of our Code bearing on trusts would have been sufficient to rule out such a fragile idea and dangerous as well.

In the present opinion of the majority an effort is made to engraft the Anglo-Saxon theory of the divisibility of the title into legal title and equitable property. This is the worst approach to solve the question, because such a thing not only does not exist in civil law but would also contradict the very theory of the transfer of ownership to the fiduciary, as pointed out by Dr. Alfaro himself—pp. 52–55 of the article *supra*—a requirement *sine qua non* for the individualization of the patrimony in favor of a third party in such countries where the acceptance by the beneficiary is not necessary to perfect an obligation in his favor, something which, as has been seen, does not occur in Puerto Rico.

But even assuming that a trust inter vivos for the benefit of a third party were perfected by the mere acceptance by

the fiduciary, we would still have to investigate whether the transfer of property is not expressly prohibited by our Code, since our Code expressly provides in § 855 that the constituent may create a trust in any form, for any purpose, and upon any terms or conditions not contravening the *law*, or not specifically prohibited by this Code.

We know that the Anglo-Saxon trust has been used to regulate all kinds of family relations, precisely because there is no limitation as to the manner of testating or as to the manner of organizing the internal order of the family. In this connection, the Anglo-Saxon law is still contaminated with feudal drawbacks having their origin in the Roman law during the conquest of the Normans. Our Civil Code, on the contrary, is the product of the liberal complex as to family and property relations characteristic of the nineteenth century, an anatomically revolutionary century essentially inspired on statism, whose historic mission was to liquidate all prerogatives and privileges of a nobiliary society in which the freedom to dispose of any patrimony was absolute and the will of the father was sufficient to organize the entire internal order of the family.

In the European civil codes of the nineteenth century all these paterno-filial institutions of nobiliary origin are transformed into public law institutions which are imposed upon the father as real obligations rather than as rights. As stated by Puig Peña in referring to the *patria potestas:* " . . . A general principle which governs the institution underlies the whole subject matter, to the effect that the *patria potestas* must be conceived and executed as a function which the State recognizes to the parents with respect to the children, for the benefit of the latter . . . ," the features of the *patria potestas* being, therefore, the following: "(*a*) It constitutes, above all, *a duty or obligation which can not* be excused [or renounced] for it is imposed on the parents by virtue of the supreme principles of the family morale and social reason of the State, which incor-

porates the same therein as subject to those to whom it corresponds exclusively. (*b*) *This obligation is personal in character* and may not be fulfilled through a third person. . . . (*c*) Moreover, *it is not transferable;* the father can not transmit *en bloc* to a third person the *patria potestas* over his children. . . . (*d*) Lastly, it represents a positive obligation of continuous performance, which requires and demands an efficient and unfailing conduct which will satisfactorily meet the responsibility inherent in the *patria potestas.* . . ." As to the administration of the property of the minor, Puig Peña further says: "In addition to the foregoing duties, the parents must administer faithfully the property belonging to the children who come under the *patria potestas.* This administration being traditionally treated as a diverse exclusive benefit of the father, since it is considered as part of the complex duties inherent in the *patria potestas.* . . . A result of this criterion is the *unwaivability of the administration,* for such unwaivability is established principally for the benefit of the minors and to preserve better order in the family. . . ." As to the *right of representation*—§ 155 of the Spanish Civil Code (§ 153 of our Civil Code)—Puig Peña goes on to say that it belongs to the father . . . "which representation, notwithstanding the incomplete drafting of the Code, *should be amply considered in the exercise of such powers as correspond to any function of natural law,* and equivalent, at least, to that attributed to the tutelary institution, without any limitations other than those expressly provided by the legal provisions" (certain cases of representation at a trial and representation in case of conflicting interests). Puig Peña, *Tratado de Derecho Civil Español,* Vol. II, pt. II, pp. 152, 153, 154, 178, and 180 (ed. by Editorial Revista de Derecho Privado, 1951). By the same token, the *legal usufruct* which the father has on the property of the children *cannot be waived or alienated* (Puig Peña, *op. cit.* at 175), because we are not dealing with the father's right, "his own right, but with an

attribute granted to him by law for the better fulfillment of the duties proper to the *patria potestas*," implying "that in this usufruct the father does not enjoy all the rights appertaining to the normal usufructuary."

I have made this digression to establish clearly that in Puerto Rico we cannot stand on the principle that the father has absolute freedom to organize, in the manner he may deem best, patrimonies relating to the internal organization of the family, as may be done under the Anglo-Saxon law. The father cannot renounce the administration of the property of his minor children—even if such property is a gift (§ 157 of our Civil Code)—nor the representation of the actions involving such property; nor may he waive or alienate the legal usufruct which the father has on the property of the minor children, for such duties are public duties not subject to private contracts.

Incidentally, the establishment of a trust inter vivos by the father for the benefit of the minor children who live with the parents creates an evasion of the right of the State to investigate any alienation of property of minors which it may approve or disapprove; a waiver by the father, in favor of a third party, of the administration of the minors' property; a waiver by the father, in favor of another person, of the minor's representation in actions involving such property; and a waiver in favor of another person of the legal usufruct enjoyed by the father on the property of a minor child for the benefit of the minor. It cannot even be imagined that the legislative intent was to sacrifice the greater part of the family statute to authorize the use of a single contract.

The present majority opinion considers the possibility of authorizing, as a contract inter vivos, a gift by the father in favor of a minor child who lives with his father, without deciding, of course, how the contract is perfected by the acceptance by the minor, which is the true algid point of the question. In the previous opinion of this case, consider-

ing the possible impact of § 156 of the Civil Code of Puerto Rico, which provides that the father or mother possesses the ownership and usufruct of whatever property the child may acquire with the capital of each of his parents, and in an appropriate situation of facts, such as the transfer in favor of two minor children of certain corporate shares owned by the father, and in view of the contention of the Secretary of the Treasury that such transfer was tantamount to a gift, we held that such gift would produce the legal anomaly of a gift for the benefit of the donor himself, for § 156 does not recognize the separability of property or gains between minors who live with their parents and the parents, whenever such property is derived from the parental estate. It may well be that the language used was not precise enough, and after reconsideration I believe we should clarify it further.

A gift which is to become effective inter vivos shall be governed by the general provisions of contracts. Section 562 of the Civil Code of Puerto Rico. There is a general prohibition to the effect that parents cannot contract with their minor children, because under the law a contract is the meeting of two or more distinct and autonomous minds. Ever since Partida Fifth (Title V, Law 2), it was provided that father and son cannot contract for both "are naturally and considered in law" as one only person. The applicable section is § 1213 of our Civil Code, which provides: "There is no contract unless the following requisites exist: 1. *The consent of the contracting parties.* 2. A definite object which may be the subject of the contract. 3. The cause for the obligation which may be established."

In his commentaries on the absolute and radical nullity of contracts, Castán points out: "A contract may be considered in our law as nonexistent or entirely void in the following cases: (A) Whenever it lacks any of the elements necessary for its making (hypothesis of § 1261) [§ 1213 of our Code], that is: (*a'*) When there is absolute lack of con-

sent, as in the case of an act which has been termed false or simulated (with absolute simulation), or when the consent was not given because of the lack of conformity between the offer and the acceptance; (*b'*) *lack of the meeting of two or more distinct and autonomous minds (Judgment of March 6, 1909 (Spain) rendered in a case involving a contract made by a father with his minor children)*; (*c'*) lack of object; (*d'*) absence or illicitness of the consideration (§ 1275) [§ 1227 of our Code]; (*e'*) Nonobservance of the statutory requirements in the nature of essential requirement (as in the mortgage or gift of real property without a public deed); (B) where *the contract has been executed in violation of a legal provision or prohibition based on reasons of public policy* (hypothesis of § 4 of the Code) [§ 4 of our Code]; as in the case of covenants involving future inheritances (§ 1271) [§ 1223 of our Code], universal partnerships between spouses, covenants concerning the civil status, usurious contracts of the Act of July 23, 1908, etc. . . . in proper terms, it may be said that a contract which is nonexistent and absolutely void has no legal effect as such. Its characteristic is precisely the lack of specific effects. *Quod nullum est nullum producit effectum.* Under the law, such a contract is considered as not made." 3 Castán, *Derecho Civil Español, Común y Foral*, pp. 437–38 (8th ed. by Instituto Editorial Reus, 1954).

The general rule as to gifts made by fathers to the minor children who live with them is that minor children cannot by themselves accept gratuitous gifts made by the parents to such minor children, although they may accept by themselves gratuitous gifts made by third persons in favor of such minors whenever they have discernment therefor, according to our ruling in the first opinion in this same case—*Alvarez* v. *Secretary of the Treasury*, 78 P.R.R. 395, 399–400, where we established clearly the specialty consecrated by our Civil Code as to gifts made by third persons— § § 567–68.

The error which we committed in deciding the case of *Piris* v. *Registrar*, 67 P.R.R. 760—in which it is held that a minor may accept a gift from his father—consisted in applying to a gratuitous gift between father and son the rule which permits a minor child, having discernment, to accept gratuitous gifts from a third person. If we examine the authorities cited in that case, it will be noted that all of them refer to the rule which permits a minor child to accept gratuitous gifts made in his favor by third persons. In the latest edition of Castán's *op. cit. supra*, he comments that: "On the other hand, from the ruling of the Directorate of Registries of December 29, 1922, it may be inferred, although it is not expressly declared, that minors cannot appear before a notary for the purpose of accepting gifts." Castán, I-II *Derecho Civil Español, Común y Foral* 154, footnote 3 (9th ed. by Instituto Editorial Reus, 1955). Later in this opinion we will discuss this ruling.

If a child cannot accept gratuitous gifts made by his father in his favor, the question arises, who can accept on behalf of the child? In order to make as short as possible a frenzied debate—Scaevola, De Diego Valverde, Castán, Puig Peña—a solution has been suggested that the acceptance be made through a guardian *ad litem* as if it were a case involving a conflicting interest between father and son —§ 160 of our Civil Code.

But against the universality of that rule militates a moral principle—that the child should not lose dependence with respect to his father, in his intimate conception of the *patria potestas*—and a legal principle—that since the father is the true legal representative of his minor child, the appointment of a guardian *ad litem* in a case not typically of conflict of interests, would be tantamount to authorizing the renunciation of the duty to represent inherent in the *patria potestas*—which is not wholly justified, since for the act of mere liberality there would always exist the possibility of the unilateral act of the gift made by deed, which would be evidence

against third parties of its date and of the fact which gives rise to its execution—§ 1172 of the Civil Code of Puerto Rico—subject to the acceptance by the child upon emancipation or attaining majority— § § 565 and 575 of our Civil Code—and the gifts by will.

The possibility has also been considered that the acceptance by the minor be made, in representation of the minor, by the donor father himself, by means of a sort of self-contract, applying to one single patrimony the power of disposition which, in the strict theory of self-contract, is applied to the disposition of two patrimonies consolidated in the same person.

The theory of self-contract, in the case of a gift from the father to a minor, is based on two abstractions, both of which are highly debatable: (1) that a gratuitous gift is, essentially, a pure act of liberality the economical consequences of which are normally resolved in favor of the donee, and should not therefore be considered as a contract; and (2) that in a gratuitous gift it is not absolutely necessary to presuppose a conflicting interest between the father and the son—which is the alleged reason for the appointment of a guardian *ad litem*—it being possible, in principle, to authorize the concurrence in a single juridical person of the double capacity of donor and donee. This was the principle applied in the famous and rather problematic resolution of December 29, 1922, of the General Directorate of Registries: V—Roca Sastre y Molina Juyol—*Jurisprudencia Registral* —761–66 (ed. by Casa Editorial Bosch, 1953), which indeed denied the registration of a deed of gift on the ground that two of its clauses implied a waiver or settlement of the future legal portion.

A moment's reflection suffices to make us realize that in the contemporaneous world there can not conceivably exist a gratuitous gift the economical consequences of which are indefectibly resolved in favor of the donee, both at the time of its execution and thereafter. I wonder what would be

the economic philosophy prevailing in Spain on this matter; but even under the governing principles of the Spanish Civil Code, which regards every property and the profits therefrom as a limited thing subject to the orbit of public law and every transfer of property as subject to a rule, to a certain extent, it is very difficult to conceive this abstract donation as sought by the General Directorate in which everything is indefectibly resolved in favor of the donee.

It is a safer rule to conceive every transfer of property as a complex of present and future rights and obligations, capable of transforming itself at any moment into a real burden. This is an experience preeminently American, characteristic of the mechanics of depression and emergency economy, which has precisely its neuralgic point in the income tax.

As to the case at bar—diversification of an income tax where the taxpayer alleges that part of the tax should be imposed on the minor's patrimony, subject to a trust, which is, in legal substance and by express declaration of Act No. 103 of April 25, 1950 (Sess. Laws, p. 262), a gift—it appears that the potentiality of a conflict of interest cannot be as easily ruled out in the gratuitous gift as it seems. There is no question that the most immediate and evident effect of every paternal gift is to shift to the child part of the father's tax burden. This being so, we would have before us a typical case involving a conflict of interest in which the judicial authority should intervene, a criterion which we rejected in *Belaval* v. *Court of Eminent Domain*, 71 P.R.R. 246.

It is curious to note the reaction of the Spanish civil jurists on this decision of December 29, 1922 of the General Directorate of Registries. In referring to this decision, Valverde affirms that "as to acts performed with one's self outside the field of representation, such as in the case of the mortgage of the owner, I believe that they cannot be called contracts but rather unilateral juridical acts, pre-

cisely because there is no clash or conflict of interests between different persons, and the dual personality of the maker of the instrument may be readily admitted and validated. (P) But a self-contract *when it operates within the field of representation,* requires certain guarantees: the double will of an individual so that it can be wholly validated at law. In the voluntary representation, *only when the agent is expressly authorized to self-contracting (selbscontrahiren),* may he perform acts which are wholly valid, and in the legal representation, such as tutors and the parents, v. g., the law should require either *express legal authorization* to simplify them, *or the ratification of the acts by the persons represented,* or the *intervention of other persons or bodies who represent the persons under protection in these cases,* for only then will the interests of those who are protected by the law be guaranteed. . . . The European civil codes do not favor the validity of acts in which the legal representatives contract with themselves, and many of them adopt guarantees to render them effective, cause other persons to intervene, or require special requisites as to form, *but it may be affirmed in general that they are opposed to such acts.*" See *Revista Crítica de Derecho Inmobiliario,* Vol. II, No. 19, pp. 782–83 (1926).

Castán, on his part, in reaffirming his commentaries on the capacity of the minor to accept gifts from third persons, which we commented at length in our original opinion in this same case (pp. 399–400), adds this short commentary: ". . . On the other hand, from the ruling of December 29, 1922, of the Directorate of Registries it may be inferred, although it is not expressly declared, that minors cannot appear before a notary for the purpose of accepting gifts." Castán, I-II *Derecho Civil Español, Común y Foral* 154, footnote 3 (9th ed. by Instituto Editorial Reus, 1955).

Puig Peña, on the contrary, "points out the inconsistency between the Supreme Court of Spain and the General Directorate of Registries." He states that, while the de-

cision of May 30, 1950—which, by the way, also denied the registration sought relying on the decision of December 29, 1922—does not exclude at all the possibility of self-contract when it is not accompanied by conflicting interests or *by the risk of causing present or future detriment* to the rights of one of the parties, the Supreme Court of Spain in its Judgment of March 6, 1909, which we comment here, objected to its admission on the ground that two or more distinct and autonomous wills should always concur in every contract. IV–II Puig Peña, *Tratado de Derecho Civil Español*, pp. 28–29 (Editorial Revista de Derecho Privado, 1951).

The authority on which the opinion of the majority seems to rely is the article by Federico Castro, *El Autocontrato en el Derecho Privado Español*, 151 *Revista General de Legislación y Jurisprudencia* 395–455, at 414–21 (1926), in which the decision of December 29, 1922 is commented. If we examine closely this entire essay, particularly pp. 362–86, it will be seen, as stated by Castán, that "it takes up the self-contract *independently of the representation*, considering it as a unilateral act having special characteristics which may arise in all those situations where a person, *having the power to dispose of two independent patrimonies*, creates binding juridical relations between them" —3 Castán, *Derecho Civil Español, Común y Foral* 354, n. 1 (8th ed. by Instituto Editorial Reus, 1954)—as in the case of the "title holder of a patrimony and the administrator of another, or the administrator of two extraneous and distinct patrimonies, which establishes a juridical relation between his patrimony and the extraneous patrimony, or between the two extraneous patrimonies," or "the case of two special patrimonies, as for example, a dowry and paraphernal property, or the free property and those subject to substitution, or one's own patrimony and that acquired by inheritance accepted for the benefit of inventory." But, "in the case of representation, the conflict of interests is much more frequent than in that of special patrimonies belonging to the

same title holder; the result being that the juridical act with himself becomes less possible in the former case." 3 Castán, *op. cit.* at 354.

As has been noted, a contract between a father and his own child should not be favored, not even under the theory of self-contract, which as yet is exactly that, a theory, among the many theories that abound in the juridical literature looking for a legislative future, applied only until now as a practical formula within the registral jurisprudence and not yet accepted by the civil jurisprudence of the Supreme Court of Spain.

The sight of the father locked in an office with his notary and structuring, against public policy, the future organization of the property of his minor children, is a feudal sight which positively hurts the liberal conscience of our new civil times. For the promotion of the economic independence of the minor child, at an opportune age, the civil law provides the institution of *peculium profectitium*, which is better reasoned and more carefully framed within the spiritual elements of the *patria potestas* as well as within the social elements of family institution. It goes without saying that such paternal self-contract shall work a terrible impact on our entire income-tax institution. It is as if the distribution of the tax burden were left to the taxpayer's discretion.

It is worthy of note that in sanctioning, in an indirect manner, the paternal self-contract, the opinion of the majority, on the one hand, revives the case of *Piris* v. *Registrar*, *supra*, in which it is held that a minor child may accept by himself a gift from his father, and, on the other hand, it consecrates the paternal self-contract in which the father himself is the one who accepts, in representation of his minor child, the gift which the father himself makes. But as to the last aspect of the question, which is of utmost importance because it deals with the separability of property or gains between minors and their parents, when the donated

property flows from the paternal estate, it remains silent. However, in an income-tax case it is essential to know who owns the rent or usufruct from the property donated by the parents to a minor child.

There are two ways of deciding this question: (1) either to consider this gratuitous gift as any other patrimony acquired by labor, industry, or lucrative title from a third person, in which case the property would belong to the minors and the usufruct to the parents with *patria potestas* over them—premise of § 155 of our Civil Code— (2) or to consider such gift as any other patrimony acquired with the paternal estate, in which case both the property and the usufruct of whatever the child may acquire would belong to the parents with *patria potestas* over them—premise of § 156. To me it is unquestionable that, except in the cases of renunciation permitted by law—estate delivered to the children to be worked by them, or a gift or legacy made by third persons for their education—the paternal usufruct extends to all the rest of the property belonging to the minor child and is not waiveable as being contrary to public law. Because I believe this to be so, I affirm that, insofar as rents and gains are concerned, which is the question before us, a gratuitous gift from a father to his minor child produces the anomaly in law of being a gift in favor of the donor himself, for such rent and gains would always belong to the father in usufruct and, as such, would be taxable as income of the father.

On the other hand, the opinion of the majority finds support to justify a trust inter vivos made by the father in favor of the minor children who live with him, on the provision of § 845 of our Civil Code concerning trusts. It provides: "The constitution of a trust in favor of a nonexisting person, excepting only future children of the constituent, is null and void." The majority is of the opinion that "it is difficult to believe that the Legislature meant to permit the

establishment of such trusts created by a father for future children but to prohibit them for children already born."

It will be seen at first blush that it involves the reformulation, absolutely unnecessary, of the typical fideicommissary substitution by survival of the children—juridical position of the *nascitarus*, as pointed out by Puig Peña, to prevent the annulment of the trust, which can never affect the legal portion by the birth of a posthumous child, in the same way that it is used in our hereditary system, to prevent the annulment of the institution of heirs by the birth of a posthumous child—§ 742 of the Civil Code of Puerto Rico. Such provision could only be used in a trust *mortis causa*. It is so recognized by Dr. Alfaro himself—*op. cit.* at 81. Its inclusion in our provisions dealing with trusts is accounted by the fact that Dr. Alfaro's draft was designed to serve both as a trust inter vivos and as a trust *mortis causa*, a situation which evidently the majority opinion chooses to ignore.

Final conclusions: There is nothing in the legislative history of the Puerto Rican trust to enable us to conclude that, in adapting some of the features of the Panamaian trust, it was the intent of the Legislature of Puerto Rico to set aside the institutions bearing on the internal order of the family and to alienate the power of the State in everything concerning the contracting by minors.

Every trust inter vivos for the benefit of a third party partakes of the nature of a contract, which requires for its perfection the express consent of the three parties which are bound by its terms. The mere acceptance by the fiduciary of the agency of the constituent neither binds the minor beneficiary nor creates the individualization of the trust property in favor of such minor.

The transfer of the constituent's property to the fiduciary does not entail full ownership, for such transfer preserves all the characteristics of a relation between the principal and the agent. It is only through the acceptance by a

60

third beneficiary that a trust inter vivos may accomplish the individualization of the trust property, as something distinct from the constituent's patrimony.

Although a minor child, with discernment, may accept a gratuitous gift from a third person, he cannot accept a gift from his father because there is lacking the meeting of two distinct and autonomous minds. The acceptance by the donor father himself, in representation of his minor child, of a donation made by the former on behalf of the latter should not be favored.